GRAYBAR ELECTRIC COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57058.   Filed February 11, 1958.

*Paul L. Peyton, Esq.*, and *John J. Fogarty, Esq.*, for the petitioner.
*Charles B. Markham, Esq.*, for the respondent.

822

828

830

OPINION.

RAUM, *Judge:* Petitioner contends that the so-called special death benefits represented compensation for services rendered and were

therefore deductible under section 23 (a) (1) (A) of the Internal Revenue Code of 1939.[2] The Commissioner, on the other hand, argues that the payments in fact arose out of a stockholder relationship, that they were in reality additions to the purchase price paid by petitioner when it exercised its option to reacquire the stock and were not in fact intended as additional compensation for services rendered by petitioner's employees. The controversy is largely factual, and the burden is upon petitioner to show that the payments were in fact made for services. We think that the burden has not been carried and that the evidence more convincingly supports the conclusion that the payments were made with respect to the stock to supplement the disproportionately low price at which such stock was required to be offered for sale to petitioner after the death of a stockholder. Accordingly, we must sustain the Commissioner's determination that the payments did not represent compensation for services rendered and are therefore not deductible under section 23 (a) (1) (A).

At the outset, it should be kept in mind that all of petitioner's stock was owned by its employees and pensioners, but not by all of them. To be sure, all of the employees had been given the privilege of purchasing stock, in amounts that were dependent upon length of service, total compensation, and position held. But a number of them did not avail themselves of the opportunity, with the result that, as shown by the evidence, only about 60 per cent became stockholders. Moreover, all of the stock was held by voting trustees and was subject to severe restrictions. It could not be sold, except to petitioner, and then only at its par value of $20 a share. After the death of a stockholder, the estate of the decedent was required to offer to sell the stock to the petitioner at $20 a share.

Obviously, as the true value of the stock might rise, by reason of enhanced value of corporate assets, increased earnings, surplus, or any other factor that is a relevant consideration in the determination of value, the owner of the stock would be disadvantaged by the restriction calling for the sale of his stock to petitioner at the fixed price of $20 a share. This unhappy situation affected every stockholder, and we are convinced that the system of so-called special death benefits was designed to mitigate the hardship caused by the sale of the stock at a price that was less than its true value.

We cannot accept petitioner's position that the so-called special death benefits were in fact paid for services rendered, notwithstanding the label placed upon them. Of course, we are not at liberty to re-

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *

write contracts or to alter relationships that parties have established between themselves. But we are fully justified in examining such contracts or relationships to determine whether they are truthfully described by the labels which the parties have attached to them. And in this case, it is quite clear to us on this record that the payments in question were not in fact compensatory for services rendered.

In the first place, such payments were not made in the case of all deceased employees. They were explicitly limited to those who were stockholders. If there were two employees who had performed identical services over the years, only one of whom was a stockholder, the so-called special death benefits would be payable only to his estate or beneficiaries; no such payments were authorized on behalf of the other's estate or beneficiaries. Or, even if both had been stockholders but one had purchased a smaller amount of stock than the other, the payments in question would be geared to the amount of stock owned, and not to the services performed. Such payments were to be equal to the dividends over a 5-year period that would otherwise have been payable on the stock surrendered after the death of a stockholder.

We are not persuaded by the argument that the payments were intended as additional compensation for services. Petitioner had a comprehensive plan of extra compensation, pensions, disability benefits, and death benefits for its employees, wholly apart from the payments here in controversy. In contrast to the special death benefits, here involved, none of the benefits in the comprehensive plan is in any way conditioned upon stock ownership. It is a matter of no consequence that the provisions for special death benefits were incorporated in the general plan, for the label alone cannot change its true character. These provisions took that form as a result of a meeting of petitioner's board of directors on June 25, 1941. But far more illuminating is the evidence as to the minutes of a board meeting on May 14, 15, and 16, 1941, when it considered "the question of amending the Certificate of Incorporation and the Stock Purchase Plans to provide some increase in the purchase price in respect to stock purchased from estates of stockholders * * *" and approved a method for increasing the purchase price of the stock that was identical with that subsequently adopted under the "Special Death Benefits" label. The fact that the original plan adopted May 16, 1941, was rescinded shortly thereafter (June 25, 1941) and that on the same day a new and identical plan appeared under a different name persuasively suggests greater sophistication but not a difference in substance.

Nothing in the record before us forms the basis for a conclusion that the employees who were also stockholders rendered any special services justifying financial recognition that discriminated against other employees. We were not shown anything which tended to prove that the employees who took advantage of the stock purchase plans,

and held the securities so purchased until their death, either contributed or were thought to have contributed more valuable services to Graybar than did other employees. The conclusion is irresistible that the payments in controversy were made in respect of the stock and not in respect of services rendered.

Petitioner has placed much stress upon the discretionary powers in distributing these special benefits. But it has presented no evidence that the exercise of such discretion was in any way influenced by the quality or nature of a decedent's past services. The evidence does show that special death benefits were not paid in the case of four deceased stockholders. But the circumstances surrounding those instances were not revealed to us, and, bearing in mind the fact that burden of proof was upon petitioner, we must dismiss those instances as being inconclusive with respect to the problem before us.

Great reliance has been placed by petitioner upon *Estate of Albert L. Salt*, 17 T. C. 92, which was concerned with Graybar stock subject to the very conditions and restrictions pertinent here. But that was an estate tax case, and the problem there was to fix the value of the stock in the gross estate of a stockholder. This Court held that it was to be included at the rate of $20 a share without regard to the special death benefits that might thereafter be paid. Obviously, in view of the discretionary character of these payments, they were properly excluded as an element of value as of the date of the decedent's death. But this conclusion is a far cry from holding that the payments were in fact made for services rendered, and petitioner has completely failed in carrying its burden here to show that the payments qualify for deduction under section 23 (a) (1) (A). The present case is to be sharply distinguished from the *Salt* case.[3]

*Decision will be entered under Rule 50.*

[3] Moreover, although possibly not of crucial significance here, it is nevertheless true that not all of the facts before us—particularly evidence as to the revealing minutes of the meeting of the board of directors on May 14–16, 1941—were before the Court in the *Salt* case.